## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **FREDERICK COLEMAN,** | ) |
| **EDWARD DANIELS,** | ) |
| **JASON INGRAM,** | ) |
| **SANDY LANDERS** | ) |
| **STACY TRIMBLE,** | ) |
| **JIMMY WILLIAMS,** | ) **Case 2:22-cv-00666-MHT-SMD** |
| | ) |
| **Plaintiffs,** | ) **JURY TRIAL DEMANDED** |
| | ) |
| | ) |
| **v.** | ) |
| | ) |
| **HYUNDAI MOTOR** | ) |
| **MANUFACTURING OF** | ) |
| **ALABAMA,** | ) |
| **LLC,** | ) |
| | ) |
| **DEFENDANT.** | ) |

## AMENDED COMPLAINT

1.     Plaintiffs Frederick Coleman, Edward Daniels, Jason Ingram, Sandy Landers, Stacy Trimble, and Jimmy Williams (collectively "Plaintiffs") bring this employment discrimination action, as amended, for relief and damages against Defendant Hyundai Motor Manufacturing of Alabama LLC ("HMMA" or "Defendant") based on the following allegations and causes of action.

1

## NATURE OF THE ACTION

2.      This civil rights lawsuit arises under 42 U.S.CA. § 1981 to correct unlawful race discrimination and retaliation by Defendant.

3.      HMMA, located in Montgomery, Alabama, is one of the largest foreign-owned automobile manufacturers in North America.

4.      Despite the fact that the workforce on the manufacturing side of the plant is over 80% African-American, HMMA has a demonstrably poor history of elevating blacks to the ranks of middle and upper management. HMMA's glass ceiling translates into talented black employees being routinely denied promotional opportunities regardless of their qualification and skill sets.

5.      HMMA is a place where rank-and-file employees fear a culture of retaliation and reprisal if they report discriminatory conduct within the plant. Beginning in 2018, HMMA ordered a paralegal to compile a comprehensive list of employees who made complaints of discrimination, a compilation that HMMA has supplemented over time. She was told that the list would be shared outside the legal department for "training purposes," which is in sharp contrast with the standard business practice of insulating the identities of the sources of discrimination complaints from internal decisionmakers.

6.      HMMA routinely brandishes discipline as a weapon against employees who have the audacity to make formal complaints of discrimination.

7.      HMMA's history of disciplinary action for employees who report

2

discrimination is well known within the company, to the point that members of the Team Relations Department openly warned one Plaintiff, Edward Daniels, that he was being targeted for sabotage and termination after an attorney he retained submitted a demand letter on his behalf.

8.     At least one Plaintiff, Frederick Coleman, was told by a company official that his prospects for promotion were being hindered because of his internal complaints about discrimination.

9.     As described herein, Plaintiffs are African-Americans who, based on their race and because they reported discriminatory conditions at the plant, were subjected to unlawful adverse employment actions, including denial of promotions to positions for which they were qualified, unwarranted discipline, demotion, and termination.

10.     HMMA retaliated against Mr. Coleman, Mr. Daniels, and Mr. Landry for raising complaints of race discrimination by systematically denying them promotions. Mr. Daniels and Mr. Williams have been subjected to ongoing adverse actions that have created a retaliatory hostile environment.

11.     Mr. Trimble was prevented from receiving promotions because of his race and because he raised an internal complaint of race discrimination. He was further subjected to an unjustified disciplinary write-up in retaliation for complaining about discriminatory treatment.

3

12.     Mr. Ingram was terminated in a manner entirely inconsistent with HMMA internal disciplinary policies, an event that would not have occurred but for his race.

13.     Plaintiffs bring this action to recover economic compensatory damages including back pay, front pay, and lost benefits; non-economic compensatory damages; punitive damages; as well as attorneys' fees and costs of litigation.

## THE PARTIES

14.     Mr. Coleman is an African-American citizen of the United States and a resident of the state of Alabama during the events alleged in the complaint.

15.     Mr. Daniels is an African-American citizen of the United States and a resident of the state of Alabama during the events alleged in the complaint.

16.     Mr. Ingram is an African-American citizen of the United States and a resident of the state of Alabama during the events alleged in the complaint.

17.     Mr. Landers is an African-American citizen of the United States and a resident of the state of Alabama during the events alleged in the complaint.

18.     Mr. Trimble is an African-American citizen of the United States and a resident of the state of Alabama during the events alleged in the complaint.

19.      Mr. Williams is an African-American citizen of the United States and a resident of the state of Alabama during the events alleged in the complaint.

20.    Defendant HMMA is a limited liability company located in Montgomery County, Alabama. HMMA is subject to service at its principal business address at 700 Hyundai Blvd., Montgomery, AL 36105, through its registered agent, Christopher N. Smith.

## SUBJECT MATTER JURISDICTION AND VENUE

21.    Jurisdiction of this court is invoked pursuant to 28 U.S.C.A. §§ 1331 and 1343.

22.    Venue is proper in this district and division under 28 U.S.C.A. § 1391, as HMMA conducts business, and the alleged unlawful acts occurred, in this district and division.

## FACTUAL ALLEGATIONS

### HMMA's status as an economic powerhouse in Alabama

23.    HMMA was incorporated in 2002.  The company was the product of an elaborate search and recruitment process by multiple states.  Alabama's commitment to Hyundai is the single most comprehensive economic development incentive package in the state's history.

24.    Over the past two decades, HMMA has grown into a multibillion-dollar enterprise that is one of the most sophisticated automobile assembly operations in the industry. It is currently ranked as the most productive automotive plant in North America and the second most productive in the world, churning out

approximately 370,000 cars annually. Its output includes some of the best sales generators in the American automotive sector: the Sonata and Elantra sedan, the Santa Fe and Tucson SUV, and the Santa Cruz sport adventure vehicle. The plant has been selected to be the main base for Hyundai's American electric vehicle fleet, the Santa Fe hybrid and the Genesis GV70, during the coming decade.

25.    The HMMA plant employs over 3,500 workers at some of the highest manufacturing sector wages in the Southeast. It is one of the strongest instruments of upward mobility in Alabama's Black Belt, a part of the state that is economically stagnant and plagued by poverty and low wages.

26.    Approximately 85% of the Hyundai production and assembly workforce is African-American.

## HMMA's operational structure

27.    HMMA maintains a tiered leadership structure.  Within the production and assembly structure, approximately 200 individuals are employed as frontline floor supervisors called Team Leads, while approximately 75 persons are designated as Group Leads. Each Team Lead supervises 8 to 16 team members. Each Group Lead oversees approximately 15 Team Leads.

28.    Group Leads are tasked with oversight of routine operations and direct assignment rotation and scheduling. Group Leads have disciplinary authority as well.  Team Leads are hourly employees, earning in the general range of $59,000

annually, while Group Leads represent the first level of salaried management, with an annual compensation level of $69,000.

29.    Another 50 employees are designated Assistant Managers.  Their primary task is hiring team members, budgeting for operational tasks, and maintaining business management systems. Assistant Managers earn an average of $75,000 to $80,000 annually.

30.    At the next rung of leadership, approximately 20 individuals are Managers, who exercise business leadership responsibilities and function as the links between corporate authority and the operational functions at HMMA.

31.    HMMA also employs an estimated 100 salaried Specialists on the production side. Specialists are expected to provide problem-solving skills regarding various aspects of production and quality control.

32.    While Specialists are at the same salary level as Group Leads, the Specialist role is regarded within HMMA's personnel culture as a highly desirable assignment. Specialists function in an office setting and are not expected to perform manual labor.  They work one day shift, typically from 6:00 AM to 2:30 PM.

33.    The job of Specialist is a stepping stone at HMMA; over the past five years, more Assistant Managers have been promoted from the rank of Specialist than from the Group Lead role.

**A glass ceiling for black employees**

34.    The first two tiers of leadership at HMMA are racially diverse. Nearly two-thirds of the Team Leads and roughly 40% of the Group Leads are black.

35.    But the path of advancement for black employees noticeably narrows beginning at the Assistant Manager level. At this level of authority, only 30% are black. The Manager ranks are only 10% black. At the first tier of senior corporate leadership, Head of Department ("HOD"), black inclusion falls off the cliff. Inside the group of 15 to 20 HODs, the number of blacks has varied at any given point in the past decade between zero and one, and has never exceeded two at any one time.

36.    At any given time, 85% to 95% of Specialists on the production side are white or of Korean origin.

37.    HMMA has created an internal environment in its production and assembly operations where the numbers of African-Americans rapidly diminish at each level of higher pay and advancement, and where black employees perform the most physically demanding, high-risk work and white employees disproportionately occupy positions that consistently afford them better hours and require less wear and tear on their bodies.

38.    HMMA operates different systems for managing internal promotions. Team Leads and Group Leads are selected through an open posting process with a testing and skills component; in most departments, decision-making is in the hands of a selection committee led by Assistant Managers. In contrast, Specialists are

selected by the Managers of the respective departments, a cohort that as noted herein, is 90% white.

39.     Starting with management ranks, HMMA has installed a non-transparent, closed-door process where ultimate promotion decisions are made by the 15-member Executive Committee, which is composed of the highest levels of corporate leadership at HMMA. At the Manager level, vacant jobs are not posted and interested candidates cannot submit formal applications; and even for the lower-level role of Assistant Manager, where postings are customary and applications are submitted, the Executive Committee is the hiring authority.

40.     From 2018 until her abrupt termination in June 2022, the sole African-American member of the Executive Committee was the Director of Administration Yvette Gilkey-Shuford.[1] Ms. Gilkey-Shuford was literally the one black employee at HMMA who was consistently in a position to exert influence over promotions at the level of Assistant Manager and above.

41.     Given the near 20 year dearth of blacks in higher management roles at HMMA, ascension to the most coveted jobs at the plant lies entirely in the hands of officials who are overwhelmingly white or to a lesser degree Korean; the employees who rise mirror the decision-makers.

---

[1] Ms. Gilkey-Shuford has filed her own cause of action alleging sex and race discrimination and retaliation. *Yvette Gilkey-Shuford v. Hyundai Motor Manufacturing of Alabama*, Civil Action No. 2:22-cv-00618-CWB.

**HMMA's culture of retaliation**

42.     In late 2018, HMMA directed a paralegal in the legal department to compile a comprehensive list of employees who had previously initiated complaints of discrimination. The paralegal was told that the list was being created for "training purposes" and that its contents would be shared outside the legal department. Upon information and belief, HMMA has continued to supplement the contents of this list.

43.     The conventional practice in large corporate settings is to insulate managers and decisionmakers regarding promotions from information about the sources of discrimination complaints in order to avoid even an appearance of retaliation; this is a sensitivity HMMA apparently does not share.

44.     In 2019, a Team Relations Manager was demoted soon after voicing concerns about discriminatory promotion practices to hiring managers, as well as to an external investigator hired by HMMA.

45.     HMMA has a history of quick-trigger disciplinary actions against employees who report discrimination, routinely ignoring, with respect to these individuals, the protocols for progressive discipline and the ordinary standards for write-ups.

**Plaintiffs' employment background**

46.     In 2012, Mr. Ingram was hired by HMMA, and in 2014, he was promoted to Team Lead. In 2018, Mr. Ingram was promoted to Group Lead of the production shield line in the department tasked with painting vehicles after they were assembled.

47.     Mr. Trimble was hired in 2004 as a team member and promoted to Team Lead in 2014 in the chassis production area of general assembly. In 2018, he was promoted to a Group Lead position.

48.     A chassis is the vehicle frame and underpart of the automobile on which the automobile body is mounted. In the chassis production area, employees assemble and install the vehicle frame and foundation pieces of automobiles.

49.     Mr. Coleman was employed as a temporary worker at HMMA from 2012 to 2015, when he was hired as a full-time team member in production and general assembly. In 2017, he rose to the position of Team Lead on the chassis production line.

50.     Mr. Daniels was hired in 2012 as a team member in production/general assembly. In 2017, he was promoted to Team Lead on the chassis production line.

51.     Mr. Williams was hired in 2012 as a team member in production/general assembly, and in 2016, he was subsequently promoted to Team Lead on the chassis production line.

11

52.    Mr. Landers was hired in 2012 as a team member on the chassis production line.

**Failure to promote: Stacy Trimble**

53.    During the past four years, Mr. Trimble has interviewed for at least six Assistant Manager jobs and approximately 18 Specialist jobs.

54.    Upon information and belief, each single Specialist and Assistant Manager role Mr. Trimble applied for was ultimately filled by a white employee.

55.    Approximately five of the Specialist or Assistant Manager jobs Mr. Trimble applied for were suddenly "withdrawn" after Mr. Trimble was interviewed.

56.    For example, as recently as August 2022, Mr. Trimble was interviewed for a position as a materials handler Assistant Manager. Mr. Trimble received highly positive feedback on his interview and depth of experience.

57.    Mr. Trimble was later informed by email that the job posting was withdrawn.

58.    Approximately one week after withdrawing the position, HMMA reposted the exact same Assistant Manager job, but only permitted employees in the material handler department to apply. Since Mr. Trimble is a general assembly Group Leader, he was no longer eligible to reapply.

59.    On numerous occasions, Mr. Trimble asked his Assistant Manager, his Manager, or the HOD why given his history of strong performance evaluations and his experience, he was not being selected for positions for which he was considered. He has yet to receive a specific explanation.

60.    The white employees promoted in lieu of Mr. Trimble have consistently had less extensive experience at HMMA and in some instances have had performance or disciplinary issues. At least one white employee was selected, despite a record of complaints about that individual's professionalism and leadership skills, for an Assistant Manager role for which Mr. Trimble applied.

**Retaliatory discipline: Stacy Trimble**

61.    In late 2021, Mr. Trimble complained to the Team Relations Department, which handles internal personnel complaints, that his Assistant Manager Bobbie Ford and Manager Patrick Purter were subjecting him to unfair treatment in comparison with his white peers, specifically including degrading and threatening language, micromanagement, and extra scrutiny of his work assignments.

62.    In early 2022, Ford issued Mr. Trimble a disciplinary or performance-based write-up, his first in 18 years of employment at HMMA.

63.    The basis for Ford's write-up was strikingly vague by HMMA standards—that Mr. Trimble needed to be more "aware" of his production lines and why downtime, or periodic interruptions, were occurring.

64.    Ford skipped the first step in HMMA's progressive discipline policy. Under the policy, employees should first receive a "discussion plan" before being issued Phase I, II, and III write-ups. Ford skipped the discussion plan step and issued Mr. Trimble a Phase I write-up.

65.    It is well understood that write-ups at Phase I or above are criteria to be considered in the promotion process.  In fact, a write-up at the next level, Phase II, precludes an employee from consideration for a promotion for a period of time.

66.    Mr. Trimble appealed the Phase I write-up through a multi-stage appeal process, and in April 2022, the write-up was overturned.

67.    During the three-to-four-month time frame in which Mr. Trimble's disciplinary write-up was in place, his prospects for promotion to roles for which he was qualified were compromised.

**Complaints of racially charged incidents on the chassis production line**

68.    Between 2019 and 2021, a series of racially charged incidents occurred on the chassis production line, all involving complaints of mistreatment and intimidation of African-American workers.

69.     In 2019, a white Manager, Jeffrey Swann, physically struck a black temporary worker in the head in front of approximately 13 other HMMA employees.

70.     Swann noticed the worker had his head down on a table in the break room and struck him on the back of the head while saying to him, "We don't sleep on the clock."

71.     HMMA has adopted a "zero tolerance" policy toward physical force or contact in the workplace and has relied on this policy as grounds for termination of black employees.

72.     Rather than discipline Swann, HMMA terminated the temporary employee within a few months.

73.     In fall 2020, a white Manager, Dan Smith, approached a group of approximately 30 black employees standing outside and said, "Master Swann wants y'all back inside."

74.     Mr. Williams, Mr. Daniels, and Mr. Coleman were part of the group that heard Smith's comment. Mr. Daniels told Smith that he found the reference to Swann as "master" offensive.  Smith ignored Mr. Daniels's objections.

75.     Numerous black employees complained to the Team Relations staff about the "Master Swann" language, which evokes the phraseology of the South's antebellum institution of slavery and its core presumption that whites were entitled to control blacks.

76.    In early 2021, Smith issued a write-up to Demetrius Clark for looking at his smartwatch ; Clark was one of the black employees who complained about the "Master Swann" reference.

77.    The use of a write-up for looking at a watch during a shift is inconsistent with HMMA's normal disciplinary policies, which reserve formal discipline for infractions considerably more serious than looking at a watch.

78.    In March 2021, Mr. Daniels complained to the Team Relations Department about the racial climate at HMMA, including the "Master" reference by a white supervisor and what he perceived as a pattern of HMMA's failure to address complaints by black employees of racist conduct.

79.    In early March 2021, Mr. Williams, Mr. Daniels, and Mr. Coleman complained to HOD Shane Nice and Manager Patrick Purter that an Assistant Manager, Anthony Davis, regularly subjected them to less favorable behavior than was accorded to their white counterparts, including abusive language and unwarranted criticisms of their handling of their production lines, while white Team Leads were not made to endure such hostility and extra scrutiny.

80.    After Mr. Williams, Mr. Daniels, and Mr. Coleman made their complaints, Davis posted on Facebook that he "had a lot of haters, but was strapped at all times," an observation they took to be a veiled threat of violence against them. All three men reported the posting to the Team Relations Department.

81.    The day after Mr. Daniels joined in the complaints about Davis's post, a Team Relations manager warned him, "I hope you have tough skin."

**Attorney demand letter and its aftermath**

82.    In March 2021, Mr. Daniels and Mr. Williams retained an attorney in Montgomery, Alabama to explore the possibility of legal action against HMMA. The attorney sent to HMMA's Legal Department a demand letter on their behalf, raising the aforementioned instances of race discrimination at HMMA—specifically, the 2019 episode when a white manager struck a black employee, the incident involving a racist reference by a supervisor, and bullying of black employees by a supervisor.

83.    Approximately one week after the attorney retained by Mr. Williams and Mr. Daniels sent the demand letter alleging race based discrimination and harassment at HMMA, a member of the Team Relations staff interviewed Mr. Daniels.

84.    During the interview, Mr. Daniels was directly challenged on why he sought out a lawyer to remedy workplace problems at Hyundai, to which he replied, "Because Hyundai sweeps everything under the rug, and nothing gets done."

85.     The Team Relations staffer told Mr. Daniels that going forward, he had a "red dot" on his back, a comment that Mr. Daniels took to mean that he might be targeted for reprisals.

86.     After Easter 2021, HMMA terminated Swann and Smith.

87.     After Swann and Smith were terminated, another Team Relations staffer pointedly warned Mr. Daniels, "Y'all better watch out—they after y'all, you got your boys fired."

**Retaliatory harassment and denial of promotions: Edward Daniels**

88.     Since the March 2021 demand letter and the termination of Smith and Swann, Mr. Daniels has received periodic performance write-ups, in October 2021, March 2022, and April 2022. Prior to the March 21 letter, upon information and belief, Mr. Daniels had never received a corrective action.

89.     Mr. Daniels internally challenged all three write-ups through HMMA's internal grievance process, and each ended up being reversed.

90.     Earlier this year, a Human Resources staffer told Mr. Daniels, "Be careful—they are trying to sabotage your work."

91.     In April or May 2022, after the reversal of his third write-up, a Team Relations staffer told Mr. Daniels, "They mad [sic] you keep getting these reversed—they want you fired."

92.     In July 2022, Mr. Daniels applied for two Group Lead positions.

93.     On August 29, 2022, Mr. Daniels sent a formal, written complaint to his HOD, Manager Purter, Assistant Manager Ford, several other members of the management team, the Team Relations Department, and the Legal Department. Mr. Daniels complained about a pattern of unfair treatment and sought to arrange a meeting with management and Human Resources to address his concerns. He has yet to receive a response to his email.

94.     In October 2022, Mr. Daniels applied for a general assembly Specialist position.

95.     HMMA notified Mr. Daniels of his failure to be selected for either the Group Leader or Specialist roles without inviting him to interview for any of the jobs he sought.

96.     HMMA's policy and custom are to interview every applicant for a posted promotion.

97.     Mr. Daniels was the most experienced of the applicants for the Group Leader role, with two to three more years of experience than the other candidates. At HMMA, the length of experience in a supervisory position is a major criterion for promotion to the next level of leadership.

98.     Mr. Daniels has suffered stress and anxiety because of the warnings of reprisals and has been placed on stress-related medical leave since on or about September 1, 2022.

**Retaliatory harassment: Jimmy Williams**

99.     After the attorney retained by Mr. Williams and Mr. Daniels sent HMMA a formal letter complaining of race discrimination, in March 2021 a Team Relations staffer told Mr. Williams, "Y'all got them on pins and needles."

100.    Approximately 30 days after the demand letter complaining of race discrimination was sent to HMMA, Mr. Williams was issued a Phase III write-up by HOD Nice, one of the higher management officials to whom he had reported Assistant Manager Davis's preferential treatment of whites. The ground for the write-up ostensibly was a production defect caused by Mr. Williams's team.

101.    The write-up did not conform to HMMA standards for written discipline in that it did not identify a specific date or time of the alleged defect and contained no photographs of the alleged faulty product.

102.    Phase III write-ups are reserved for "serious misconduct" and mean that an employee is on a probationary period for 36 months, during which any misstep can cause instant termination and the employee is ineligible for promotion.

103.    Mr. Williams appealed the write-up to the Department of Administration and Legal Departments, which resulted in a reduction of the discipline to a Phase I write-up on the grounds that Nice failed to follow HMMA disciplinary protocols.

**Retaliatory reassignment and demotion: Jimmy Williams**

104.   In July 2021, Mr. Williams suffered serious injuries in a slip and fall while on his shift at HMMA, and was placed on an extended medical leave.

105.   In spring 2022, while Mr. Williams remained on leave, Assistant Manager Ford informed him that upon his return, he would be reassigned to the chassis marriage area of general assembly.

106.   In chassis marriage, employees connect the engine and other internal car parts to the car frame.

107.   Chassis marriage is viewed by employees as one of the most demanding areas of general assembly; it requires the most physically intensive labor of any unit, and results in more on-the-job injuries than any other area of general assembly.

108.   HMMA's reassignment of Mr. Williams during an extended medical leave does not align with the plant's normal leave management practices. Furthermore, as a general proposition, HMMA rarely reassigns Team Leads to other departments unless it is part of a broader shift of a number of Team Leads for cross-training purposes.

109.   In mid-October 2022, Mr. Williams was cleared to return to work, but with permanent lifting and bending restrictions. He was notified days before his return that he would be demoted to a team member position, which will entail a loss of income and supervisory status.

110.    Mr. Williams's demotion is not a legitimate function of his medical restrictions; to the contrary, a team member's duties are more likely than those of a Team Lead to encompass the lifting and bending that he is restricted from performing.

111.    HMMA follows a uniform policy of refraining from demotion of supervisors returning from extended medical leave. Mr. Williams's forced return to the team member rank is a clearcut deviation from HMMA's normal practices.

**Retaliatory harassment: Frederick Coleman**

112.    In March 2021, Mr. Coleman made complaints to Team Relations about a manager's use of the racially offensive term "Master".

113.    In March 2021, Mr. Coleman also joined Mr. Daniels and Mr. Williams in making verbal complaints to HOD Nice about Assistant Manager Davis's preferential treatment of white supervisors.

114.    Within weeks of Mr. Coleman's joining his colleagues in making complaints, Davis and Mr. Coleman's Manager Patrick Purter instructed Mr. Trimble to issue Mr. Coleman a performance write-up. Mr. Trimble objected to the write-up as unjustified and instead issued Mr. Coleman a milder corrective action in the form of a discussion regarding improvement.

115.    In July 2022, Assistant Manager Ford and Manager Purter initiated a write-up for Mr. Coleman. Assistant Manager Ford and Manager Purter cited Mr.

Coleman on the grounds that a suspended car fell during a shift he was supervising; in fact, as HMMA's internal data would have verified, Mr. Coleman was not even on duty during this incident.

**Failure to promote: Frederick Coleman**

116.   During the past four years, Mr. Coleman has applied for approximately 12 or 13 Group Lead and/or Specialist roles.

117.   HMMA has denied Mr. Coleman every promotion for which he applied.  In several cases, HMMA selected substantially less-experienced employees than Mr. Coleman who were white and had not complained of discrimination.

118.   In 2021, HMMA promoted a white employee, Scott Manning, to Group Leader, even though he had less experience than Mr. Coleman.

119.   In 2022, HMMA promoted two other white employees, Clay Manning and Wesley Hill, to Group Leader even though they had less experience than Mr. Coleman.

120.   In August 2022, Mr. Coleman complained both to Team Relations and the HOD for his department, Phil Handy, that he has been subjected to reprisals and discriminatory treatment.

121.    Handy responded, "If you want to be Group Lead, leave this alone, be quiet, and make them happy", which Mr. Coleman took as direct pressure to stop making allegations of discrimination.

122.    As recently as September 2022, HMMA denied Mr. Coleman another promotion to Group Leader in favor of a much less experienced white employee.

**Discriminatory discipline and termination: Jason Ingram**

123.    After his promotion to Group Leader in 2018, Mr. Ingram made it clear to his direct supervisors that he was interested in advancement to the next rung on the promotion ladder, the position of Assistant Manager.

124.    During 2018 and 2019, Mr. Ingram was subjected to two write-ups that deviated from HMMA's standard disciplinary protocols.

125.    HMMA's Paint Department operates a small crew performing preventive maintenance tasks on weekends, and it rotates Group Leaders to supervise the process. In 2018, Mr. Ingram was running a weekend shift when he took a photo of a robot for his maintenance report while standing approximately 10 to 15 feet from the robot.

126.    A white engineer, Mary Rice, reported that Mr. Ingram violated the lock out tag out ("LOTO") procedure regarding the operations of the robot. LOTO is a routine industrial procedure for disabling equipment to avoid hazards or accidental harm.

127.   Rice violated HMMA protocols by reporting the violation to HMMA's Safety Department rather than advising the supervisor of the employee committing the violation.

128.   When Mr. Ingram protested the write-up for the infraction, a Team Relations employee agreed, "This is not usually reported."

129.   A HMMA safety officer observed to Mr. Ingram that "this isn't something you're normally written up for."

130.   HMMA's progressive disciplinary policy further dictates that employees should receive warnings for misconduct prior to being issued write-ups. Rice's conduct, which resulted in a written safety infraction for Mr. Ingram, did not adhere to HMMA's policies regarding progressive discipline.

131.   In yet another departure from HMMA's practices, his first write-up was coded as a "serious misconduct" offense, which, as noted herein, triggers a three-year probationary period during which an employee is rendered ineligible for promotion. But according to the HMMA handbook, LOTO violations should only be coded serious misconduct if the violation is willfully done; there was no finding of willfulness, particularly in light of Mr. Ingram's unfamiliarity with the weekend maintenance shift.

132.   In February 2019, HMMA issued Mr. Ingram a second write-up after Ms. Rice and two of her white engineering department coworkers reported a second alleged LOTO procedure violation.

133.   As with the prior incident, Mr. Ingram was working in an unfamiliar area of the Paint Department during a weekend maintenance session when he did not perform a LOTO procedure.

134.   Rice and another white coworker once again bypassed protocol to lodge a safety complaint.

135.   Mr. Ingram's Assistant Manager assured him on multiple occasions during the next months that he did not believe the LOTO violations were significant and that they did not reflect his own assessment of Mr. Ingram's capabilities.  At no point was Mr. Ingram advised that his job was in jeopardy.

136.   Mr. Ingram was one of a limited number of Group Lead level personnel scheduled to travel to Hyundai's training facility in South Korea in November 2019 for training regarding the new Hyundai vehicle launch; selection for the trip was regarded as a perk for lower-level managers deemed to be rising stars in the company.

137.   On September 4, 2019, HMMA abruptly terminated Mr. Ingram at the end of his shift. In the interim since the second LOTO charge, Mr. Ingram incurred no additional discipline and was not apprised of any outstanding performance issues.

138.   Mr. Ingram's termination approximately seven months after a disciplinary write-up is inconsistent with HMMA's normal disciplinary process, which values expedited resolution.

139.   HMMA has treated numerous white employees who have committed safety infractions more leniently than Mr. Ingram.

**Failure to promote: Sandy Landers**

140.   Mr. Landers has an associate's degree in administration and supervision from Auburn University in Montgomery. Prior to being hired at HMMA, he had approximately ten years of supervisory experience at three industrial production plants.

141.   In 2015, Mr. Landers filed a charge of discrimination against HMMA with the Equal Employment Opportunity Commission ("EEOC"), alleging that because of his race, he had been subjected to more physically burdensome job assignments than his white counterparts and that he was denied opportunities to rotate into tasks that were stepping-stones to promotion.

142.   The EEOC executed a settlement of Mr. Landers's charge on September 16, 2015.

143.   The next month, Mr. Landers learned that a specialist position to which he applied was suddenly "being placed on hold until further notice."

144.   In the last seven years, Mr. Landers has continued to seek advancement to better paying leadership roles at HMMA, applying for over 100 openings, including specialist and team lead. The majority of those applications have occurred since the beginning of 2019, including 15-20 applications in the past

four years for team lead openings, the next rung on HMMA's ladder for Mr.

Landers.

145.   Mr. Landers has been denied every promotional opportunity he has

sought, despite meeting the qualifications for every job for which he has applied,

and within the past four years, has seen numerous individuals with substantially

less experience promoted instead of him.

146.   On at least one occasion since 2019, Mr. Landers has been told by a

team leader that certain lower level managers have specifically instructed that Mr.

Landers should be targeted for discipline and especially onerous assignments.

147.   Mr. Landers was one of the employees listed in the original 2018

compilation of employees who had filed previous complaints of discrimination.

**Hyundai's pattern of discrimination and retaliation**

148.   42 U.S.C.A. §1981 prohibits racial discrimination or retaliation in the

"making, performance, modification, and termination of contracts and the

enjoyment of all benefits, privileges, terms and conditions of the contractual

relationship." An at-will employment relationship is a contractual relationship

within the meaning of §1981.

149.   HMMA has built a culture of turning discipline into a weapon against

black employees who are marked as candidates for advancement or who raise

complaints about discriminatory conduct at the plant. The trend is visible enough

that members of the Team Relations Department warned two of the Plaintiffs, Mr. Daniels and Mr. Williams, that their complaints ensured they would be targeted.

150.    HMMA limits management-level advancement opportunities for black internal candidates through a tightly controlled, non-transparent selection process for which the decision makers are monolithically white or Korean.

151.    But for the fact that they were in two protected groups, African-Americans and persons who opposed race discrimination, Plaintiffs would not have been subjected to unlawful treatment. As Justice Gorsuch concluded in *Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020), "The adoption of the traditional but-for causation standard means a defendant cannot avoid liability by citing some *other* factor that contributed to its challenged employment decision, as long as the impermissible factor was "a" or "one" as opposed to "the" cause of the decision (italics in original).

**COUNT I**
**STACY TRIMBLE**
**42 U.S.C.A. § 1981 FAILURE TO PROMOTE**
**(RACE DISCRIMINATION AND RETALIATION)**

152.    Plaintiff Trimble incorporates the preceding paragraphs as if set forth fully herein.

153.    During 2021, Trimble, who is African-American, engaged in protected activity under 42 U.S.C.A. § 1981 by complaining of racially discriminatory conduct at HMMA.

154.    During the past four years, HMMA repeatedly declined to promote Plaintiff Trimble to approximately six Assistant Manager jobs and approximately 18 Specialist jobs for which he was highly qualified.

155.    Instead of promoting Plaintiff Trimble, HMMA elevated white candidates and candidates who had not complained of discrimination whose credentials and experience were inferior to Plaintiff Trimble's.

156.    Plaintiff Trimble's opposition to discrimination and his race were each a but-for cause of HMMA's discriminatory decision to deny him promotions and career advancement opportunities for which he was qualified.

157.    As a result of HMMA's retaliatory and racially discriminatory practices, Plaintiff Trimble suffered economic losses and experienced mental anguish and emotional distress.

## COUNT II
### EDWARD DANIELS
### 42 U.S.C.A. § 1981 FAILURE TO PROMOTE
### (RACE DISCRIMINATION AND RETALIATION)

158.    Plaintiff Daniels incorporates the preceding paragraphs as if set forth fully herein.

159.    During 2020, 2021, and 2022, Plaintiff Daniels, who is African-American, engaged in protected activity under 42 U.S.C.A. § 1981 by complaining of racially discriminatory conduct at HMMA.

160.   Since engaging in protected activity, Plaintiff Daniels has unsuccessfully applied on multiple occasions within the past two years for promotions to the positions of Group Lead and Specialist.

161.   HMMA has declined to promote Plaintiff Daniels and in the process has failed to follow its protocols for interviewing candidates, selecting candidates less qualified than Plaintiff Daniels who are white or have not made complaints of discrimination.

162.   Plaintiff Daniels's opposition to race discrimination and his race were each a but-for cause of HMMA's discriminatory decisions to deny him promotions for which he is well qualified.

163.   As a result of HMMA's discriminatory and retaliatory practices, Plaintiff Daniels suffered economic losses and has experienced mental anguish and emotional distress.

## COUNT III
### FREDERICK COLEMAN
### 42 U.S.C.A. § 1981 FAILURE TO PROMOTE
### (RACE DISCRIMINATION AND RETALIATION)

164.   Plaintiff Coleman incorporates the preceding paragraphs as if set forth fully herein.

165.   During 2021 and 2022, Plaintiff Coleman, who is African American, engaged in protected activity under 42 U.S.C.A. § 1981 by complaining of racially discriminatory conduct at HMMA.

166.   Since engaging in protected activity, Plaintiff Coleman has applied for promotions to Group Leader and Specialist roles.

167.    HMMA repeatedly denied Plaintiff Coleman every promotion for which he applied and, in several cases, HMMA hired less-experienced candidates than Plaintiff Coleman who are white or have not made complaints of discrimination.

168.   Plaintiff Coleman's race and protected activity were both but-for causes of HMMA's discriminatory decisions to deny him promotions for which he was well qualified.

169.   As a result of HMMA's discriminatory and retaliatory conduct, Plaintiff Coleman suffered economic losses and has experienced mental anguish and emotional distress.

**COUNT IV**
**STACY TRIMBLE**
**42 U.S.C.A. § 1981**
**(RETALIATION)**

170.   Plaintiff Trimble incorporates the preceding paragraphs as if set forth fully herein.

171.   Plaintiff Trimble engaged in protected activity under 42 U.S.C.A. § 1981 by initiating internal complaints of racially discriminatory treatment by higher-level supervisors.

172.    HMMA subjected Plaintiff Trimble to disciplinary action because he complained of race discrimination.

173.    The retaliatory conduct Plaintiff Trimble experienced would have dissuaded a reasonable employee from complaining about race discrimination.

174.    As a result of HMMA's retaliatory conduct, Plaintiff Trimble suffered potential economic losses and has experienced mental anguish and emotional distress.

## COUNT V
## EDWARD DANIELS, JIMMY WILLIAMS, AND FREDERICK COLEMAN
## 42 U.S.C.A. § 1981
## (RETALIATORY HOSTILE ENVIRONMENT)

175.    Plaintiffs Daniels, Williams, and Coleman incorporate the preceding paragraphs as if set forth fully herein.

176.    In 2020, 2021, and 2022, Plaintiffs Daniels, Williams, and Coleman engaged in protected activity under 42 U.S.C.A. § 1981 by raising multiple complaints of racially discriminatory conduct.

177.    HMMA subjected Plaintiffs Williams, Daniels, and Coleman to retaliatory conduct in ways including but not limited to unwarranted disciplinary action and threats of termination and in the case of Mr. Williams, a demotion to a lower-paying position.

178.    A reasonable employee subjected to the aforementioned retaliatory conduct would be dissuaded from complaining about race discrimination.

179.    HMMA's retaliatory conduct caused Plaintiffs Williams, Daniels, and Coleman to experience mental anguish and emotional distress.

180.    HMMA's retaliatory conduct caused Plaintiff Williams to suffer economic losses.

**COUNT VI**
**JASON INGRAM**
**42 U.S.C.A. § 1981**
**(RACE DISCRIMINATION)**

181.    Plaintiff Ingram incorporates the preceding paragraphs as if set forth fully herein.

182.    Plaintiff Ingram is African-American.

183.    Plaintiff Ingram was subjected to discriminatory treatment in that HMMA enforced its disciplinary policies towards him more harshly than HMMA has treated numerous white employees who have had similar infractions.

184.    But for his race, Plaintiff Ingram would not have been subjected to disciplinary action or subsequently terminated.

185.    HMMA's racially discriminatory conduct caused Plaintiff Ingram to suffer economic loss and to experience mental anguish and emotional distress.

## COUNT VII
## SANDY LANDERS
## 42 U.S.C.A. § 1981 FAILURE TO PROMOTE
## (RETALIATION)

186.   Plaintiff Landers incorporates the preceding paragraphs as if set forth fully herein.

187.   Plaintiff Landers engaged in protected activity under 42 U.S.C.A. § 1981 by initiating a complaint of race discrimination against HMMA, which resulted in a settlement executed by a federal agency.

188.   Since he settled his race discrimination claim against HMMA, Plaintiff Landers has repeatedly sought to be promoted to higher level positions at HMMA, including approximately 20 applications for the job of team lead, most of which have been submitted between 2019 and 2022.

189.   HMMA repeatedly declined to promote Plaintiff Landers to positions for which he has superior qualifications and experience than the selected candidates, who had not engaged in protected activity at the time of their selection.

190.   Plaintiff Landers' opposition to race discrimination was a but-for cause of HMMA's discriminatory decision to deny him promotions and career advancement opportunities for which he was qualified.

191.   As a result of HMMA's retaliatory and racially discriminatory practices, Plaintiff Landers has suffered economic losses and experienced mental anguish and emotional distress.

## COUNT VIII
## PUNITIVE DAMAGES

192.   HMMA has engaged in discriminatory practices, as set forth herein, with malice or with reckless indifference to the federally protected rights of Plaintiffs under 42 U.S.C.A. § 1981. Accordingly, Plaintiffs are entitled to recover punitive damages from HMMA pursuant to 42 U.S.C.A. § 1981a(b)(1).

## PRAYER FOR RELIEF

Wherefore, based on the above-stated claims, Plaintiffs demand a trial by jury and that the following relief be granted:

back pay, front pay, and lost benefits;

compensatory damages;

punitive damages to the extent allowed by law;

attorneys' fees and costs of litigation;

pre-judgment and post-judgment interest at the highest lawful rate;

such other equitable and monetary relief as the Court deems just and proper.

Respectfully submitted, the 6th day of December, 2022.

**HKM Employment Attorneys LLP**
*s/Artur Davis*
Artur Davis
ASB 3672-D56A
2024 3rd Ave. North, Suite 307
Birmingham, AL 35203

adavis@hkm.com
205-881-0935

**The Spiggle Law Firm**
Ivey Elizabeth Best
ASB –3844-N8S
3601 Eisenhower Ave., Suite 425
Alexandria, VA 22304
ibest@spigglelaw.com
571-534-3797
**Counsels for Plaintiffs**