IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

JASON INGRAM,                    )
                                 )
        Plaintiff,               )
                                 )
    v.                           )
                                 )      CIVIL ACTION NO.
HYUNDAI MOTOR                     )      2:22cv666-MHT
MANUFACTURING OF ALABAMA,        )          (WO)
LLC.,                            )
                                 )
        Defendant.               )

OPINION

Plaintiff Jason Ingram brings this
employment-discrimination lawsuit against defendant
Hyundai Motor Manufacturing of Alabama, claiming that he
was fired because of his race, in violation of 42 U.S.C.
§ 1981. Jurisdiction is proper pursuant to 28 U.S.C.
§ 1331 (federal question) and 28 U.S.C. § 1343 (civil
rights). Before the court is Hyundai's motion for
summary judgment. For the reasons below, the motion will
be granted.

## I.  LEGAL STANDARD

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the facts in favor of that party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment is appropriate. *Id.*

## II.  BACKGROUND

The facts, taken in the light most favorable to Ingram, are as follows.

## A. Hyundai's Disciplinary Policies

Hyundai has many employees, and sometimes those employees trip up. And so, the company has several disciplinary policies designed to address employee performance issues. Usually, when employees are alleged to have performance issues, they are investigated and disciplined by their supervisor. But sometimes the process is more complicated--for example, when an employee is alleged to have committed certain safety violations. Those violations may be reported to the Safety Department, which then investigates the incident, writes a report of its findings, and sends its report to the Employment Review Committee. That committee then has one of its members decide on the appropriate disciplinary measure.

Hyundai's disciplinary process involves a series of progressively increasing punishments; the appropriate punishment is largely based on the nature of the employee's performance issue and his disciplinary history. Ordinarily, a supervisor will first respond to

3

a performance issue by making a 'discussion planner.'  A discussion planner is used to investigate the issue and start 'a conversation' between the employee and his supervisor about why the issue is happening, as well as how to fix it.  But if the employee's performance issue is severe enough, or if he continues having a milder performance issue despite a discussion planner, his supervisor may take 'corrective action.'  There are four escalating phases of corrective action ranging from Phase I (informal discussion) to Phase IV (decision leave).

Yet for certain performance issues labeled 'serious misconduct,' the appropriate response is not to create a discussion plan or follow the corrective action policy; instead, the employee who engaged in the misconduct may be immediately terminated, or, if he is not immediately terminated, he is sent a letter of conditional employment.  After receiving such letter, he must participate in a formal meeting with team relations and management.  The employee must also "develop an action plan and make a written commitment (Commitment Letter)

to successfully implement that plan." Burns Decl. Ex. A (Doc. 43-1) 15. The serious misconduct finding remains in his file for three years.

The Hyundai employee handbook provides an illustrative list of serious misconduct. In 2019, the handbook stated that "[w]illful violations" of Hyundai's 'lockout/tag out' (LOTO) policy are serious misconduct. *Id.*

The LOTO policy was designed to protect from danger all those employees "who enter machinery, work within machinery, or use machinery as part of their job duties at [Hyundai]." Burns Decl. Ex. A. (Doc. 43-2) 32. Under the policy, these employees are "issued a personal safety lock along with an identification tag." *Id.* The policy requires that, when employees enter lockout areas of a facility, they must each bring their lock and tag with them and attach the lock and tag to the lockout device on the appropriate machine control panel before entering the area. Once the lock and tag are properly attached, the machine will be prevented from accidentally

5

energizing.  "In situations where multiple persons must enter an area with a piece of machinery requiring [LOTO], each person must attach his/her lock and tag to the lockout device." *Id.* "All locks and tags must be removed before the equipment is restarted." *Id.* "Because of the differences in each machine or piece of equipment, [employees] should learn the proper method of locking and tagging each piece of equipment they operate, repair, or maintain." *Id.*  And if they are "unsure about the procedures for locking out the equipment, [they] *must* ask ... for assistance [with locking out]." *Id.* (emphasis added).  Because of the danger posed by its equipment, Hyundai requires "[s]trict compliance with the [LOTO] procedures and rules." *Id.*

### B. Ingram's First Serious Misconduct

Ingram, who is Black, worked in the General Assembly Department at Hyundai's car manufacturing plant in Montgomery, Alabama, and, in March 2019, he violated Hyundai's LOTO policy.  While working on a 'seal line,'

he entered a 'robot cell.'  Because the area contains
sealing robots that move through the area and can cause
serious injury, employees are required to lockout before
entering a cell.  When Ingram was in a cell, Mary Rice,
an assistant manager in the Engineering Department, was
contacted by a member of the robot team to examine a
robotics issue.  While she was examining the issue, she
noticed that Ingram did not lockout.  Rice went to talk
to Ingram about the situation, and he responded by
admitting that he did not lockout and indicating that he
would not fail to do so again.  Afterward, Rice told
Ingram's supervisors about the events.

The Safety Department was eventually notified of the
incident, although there is a dispute over who notified
the department.  Some evidence in the record suggests
Rice made the report, but during her deposition she
denied doing so.

Regardless of who notified the Safety Department,
the department, after receiving notice, investigated the
incident and wrote a report on its findings.  The report

concluded that Ingram committed a LOTO violation and recommended a finding of serious misconduct. The report was sent to the Employment Review Committee, which adopted the recommendation. As a result, Ingram was put on serious misconduct status, issued a letter of conditional employment, participated in a formal meeting, and developed an action plan.

### C. Ingram's Second Serious Misconduct

About five months later, Ingram committed a second LOTO violation. Despite normally working on the seal line, he was, on the day of the second violation, working in 'top coat,' an area with which he was unfamiliar. While there, he entered a lockout area to take pictures for a report, but he did not lockout. Two engineering specialists saw this potential lockout violation and reported it to Steve Cho, an assistant manager in the Engineering Department. Cho then approached Ingram to discuss the incident with him. During the discussion Ingram conceded that he did not lockout, but he explained

that he did not do so because he was unfamiliar with the area and did not know where the control panel was located. He also stated that he was worried that he might be fired because this was his second LOTO violation; he also expressed concerns that the engineering specialists were intentionally trying to get him fired.

In response, Cho stressed the importance of locking out and showed Ingram the location of the control panel where he was supposed to lockout. Cho also stated that the situation would be dealt with between the two of them, and that Ingram did not have to worry about his job or the specialists. The following day Cho notified Ingram's supervisors about the incident.

News of the violation once again made its way to the Safety Department, which investigated the incident and wrote a report on its findings. The report found that this second incident was a LOTO violation and recommended a finding of serious misconduct; the report was then sent to the Employment Review Committee. The next week, Scott Gordy--the reviewing committee member and head of the

Human Resources Department--made the decision to fire Ingram. Hyundai sent Ingram a letter notifying him that he was fired for committing two serious misconduct incidents in less than six months.


## III. DISCUSSION

Ingram's sole claim is that Hyundai fired him because of his race, in violation of 42 U.S.C. § 1981. "Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999). A plaintiff may establish racial discrimination by amassing a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker"--which is just a fancy "rearticulation of the summary judgment standard." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946-47 (11th Cir. 2023), *cert. denied*, 145 S. Ct. 154 (2024) (internal quotation omitted). Therefore, to survive summary judgment Ingram

must provide sufficient evidence for a reasonable factfinder to conclude that it was more likely than not that "race was a but-for cause of" his termination. *Comcast Corp. v. Nat'l Ass'n of Afr. Am. Owned Media*, 589 U.S. 327, 333 (2020). That is, he must show that if he were not Black, he would not have been fired.

The more traditional and frequently used method of showing that one is a victim of racial discrimination in employment is for the plaintiff to show that the person who made the adverse decision against him made a more favorable decision with regard to another employee of a different race. *See Lewis v. City of Union City*, 918 F.3d 1213 (11th Cir. 2019) (en banc). To make this showing, a plaintiff must offer up a "proper comparator," *id.* at 1217, in other words, an employee of a different race, who is "similarly situated in all material respects" but who did not suffer the adverse employment decision. *Id.* at 1226. Here, Hyundai and Ingram agree that Hyundai told Ingram that he was terminated because he had two LOTO violations; they also agree that Ingram

11

committed two LOTO violations.  And so, if Ingram were relying solely on the comparator approach, he would have to show that Supervisor Gordy, who terminated him, did not terminate a similarly situated employee (that is, one who also had two LOTO violations, etc.) of another race. But Ingram does not argue that he can provide such a comparator.

Instead, in his brief in opposition to summary judgment, Ingram posits that he has evidence that "undercut[s] the authenticity ... of [the] purported non-discriminatory rationale" for his termination.  Pl.'s Br. Opp'n (Doc. 54) 43.  More specifically, he writes that he presented "evidence suggesting that multiple company officers did not view [his] conduct as a basis for discipline *at all*."  *Id.* (emphasis in original). However, evidence that merely challenges an employer's reason for disciplining an employee is not enough to prove that the employer's decision was due to race discrimination.  An employer may discipline an employee "for a good reason, a bad reason, a reason based on

12

erroneous facts, or for no reason at all, as long as its [decision] is not for a discriminatory reason." *Flowers v. Troup Cnty. Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) (quoting *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984). All that the evidence above shows is that Hyundai may have wrongly decided to fire Ingram. But [f]ederal courts do not sit as a super personnel department that reexamines an entity's business decisions." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (internal quotation and citation omitted).

Next, Ingram states in his brief that, "Even more telling, there is evidence ... [that other Black employees] were subjected to unmerited discipline for offenses that were exaggerated and later reversed." Pl.'s Br. Opp'n (Doc. 54) 44. He then asserts that, "A jury could view this litany of infractions, none of which survived scrutiny, as evidence of a quick disciplinary trigger for Black employees." *Id.* This is a curious argument.

First, this posited evidence could reasonably be viewed as reflecting that Hyundai was careful to 'reverse' disciplinaries of its Black employees if they lacked merit, and, thus, that Hyundai was, if anything, careful not to discriminate against its employees. Second, mere evidence of "a quick disciplinary trigger for Black employees," *id.*, does not establish that these employees were subjected to such a trigger 'because of' their race.  Ingram would need additional admissible evidence, which he has not provided, to prove such.  For example, he might provide evidence that similarly situated non-Black employees did not face such a trigger. Finally, Ingram does not fall within the category of those who were subject to the "quick disciplinary trigger." *Id.* His two LOTO violations were not reversed but rather were upheld after going through the full process for review of disciplinary actions.  The evidence is insufficient to support a conclusion that Ingram's termination was a product of a "quick disciplinary trigger."

At oral argument on Hyundai's motion for summary judgment, Ingram's attorney posited two more arguments in opposition to the motion.  In addition to the fact that these arguments are due to be rejected because they were not presented in Ingram's brief, the arguments simply lack merit.

First, Ingram argued that the evidentiary record reflects a pattern or practice of discrimination by Hyundai against its Black employees.  *See Jenkins v. Nell*, 26 F.4th 1243, 1250-51 (11th Cir. 2022).  He asserts that Hyundai had a pattern of disciplining its Black employees more excessively than its non-Black ones and that his termination tracks that pattern of excessive punishment.  However, later during oral argument his attorney conceded that the record contains neither statistical nor anecdotal admissible evidence of non-Black employees who were punished less severely than Black employees.

Finally, at oral argument, Ingram's attorney suggested that, while Supervisor Gordy may not have

terminated Ingram because of his race, Gordy relied on the decision of another supervisor who, because of Ingram's race, initiated the write-up of Ingram for his first LOTO violation, which was part of the basis for Gordy's decision to terminate Ingram. *See Ziyadat v. Diamondrock Hosp. Co.*, 3 F.4th 1291, 1298 (11th Cir. 2021) ("a defendant may be held liable for the racial animus of its non-decisionmaking employee when ... that employee's discriminatory conduct causes a decisionmaking employee to take an injurious action against the plaintiff."); *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011). To support his argument, Ingram's attorney asserts that Mary Rice, a supervisor, racially discriminated against Ingram because she initiated the report that led to his first LOTO violation but she did not initiate a report on a Korean employee who also committed a LOTO violation. This argument fails as well.

First, Ingram's attorney does not provide any evidence of what happened to the Korean employee; the

record is void of evidence as to whether he was written up for a LOTO violation.  All the attorney submitted at oral argument was that Ingram "believes" that the Korean employee was not written up; the attorney did not provide evidence of the employee's employment record at Hyundai or that Ingram has personal knowledge of the record.  A mere belief of the existence of a fact is not evidence of that fact.  For all the court knows, the Korean employee may have been written-up as well.

Second, while the evidence viewed in Ingram's favor supports the conclusion that Rice initiated the report on Ingram's first LOTO violation, the evidence is insufficient for a reasonable factfinder to conclude that Rice was aware of, and failed to initiate a report on, the Korean employee 's LOTO violation.  All the court has before it are (1) Ingram's testimony that that Rice was "present" in the area when and where the Korean employee committed a LOTO violation and (2) Rice's testimony that she did not see that employee commit a LOTO of violation.

To begin, Rice's statement that she did not see the Korean employee's violation is not inconsistent with Ingram's statement that she was present when the violation occurred.  Ingram did not say that he saw her witness the violation, nor does he sufficiently describe the room or the details of the violation so that a factfinder could reasonably conclude that Rice must have seen the violation.*

The point that Ingram's deposition testimony stating that Rice was merely "present" is inadequate to show that she was aware of the violation is brought home when the question Ingram's attorney posed to Rice in her deposition is considered.  Importantly, the attorney greatly mischaracterizes Ingram's answer when questioning Rice.  He goes beyond saying that Ingram said she was "present," and says that Ingram "testified last

---

* Ingram also alleges Rice made inconsistent statements about whether she reported Ingram's first LOTO violation, and that this is evidence of both pretext and racial discrimination.  Ingram is mistaken; while this may undermine Rice's credibility it does not show that she witnessed the violation, nor does it show that she reported Ingram because of his race.

week that he observed a lockout/tag out violation ... and that [Rice] was physically in the same location *looking right at the lockout/tag out violation* that he saw." Rice Dep. (Doc. 53-12) 75:8-13 (emphasis added). If Ingram had, indeed, testified as his attorney said he did, then the picture Ingram attempts to paint of Rice would be different. The evidence would not be that she was merely "present" but that Ingram actually saw her "looking right at the lockout/tag out violation." But that was not Ingram's testimony, nor is there any evidence to that effect in the record. The fact that Ingram's attorney so plainly and substantially mischaracterized Ingram's testimony--testimony that was in response to questions the attorney himself personally posed to Ingram--demonstrates that the attorney fully appreciated that Ingram's testimony was inadequate.

Moreover, if Ingram had actually seen Rice "looking right at the lockout/tag out violation," the court is confident that his attorney would have brought that out

during Ingram's deposition and made that evidence part of the record.

## IV. CONCLUSION

For the above reasons, summary judgment will be entered in favor of Hyundai.

An appropriate judgment will be entered.

DONE, this the 17th day of April, 2025.

                    /s/ Myron H. Thompson
                    UNITED STATES DISTRICT JUDGE

20